JN:DG
F. #2019R01685

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

J&F INVESTIMENTOS SA,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. 20-CR-365 (MKB)
(T. 18, U.S.C., §§ 371 and 3551 et seq.)

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise stated:

I.    The Foreign Corrupt Practices Act

1.    The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1 et seq. (the "FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

II.    The Defendant

2.    The defendant J&F INVESTIMENTOS SA ("J&F") was a private investment holding company that owned approximately 250 companies in 30 countries worldwide and was primarily involved in the meat and agriculture businesses.  J&F was incorporated and based in São Paulo, Brazil.  J&F was wholly owned by J&F Executive 1 and J&F Executive 2, as defined below, and their family members.

III.     Relevant Entities and Individuals

3.      JBS SA ("JBS") was a subsidiary of J&F headquartered in São Paulo, Brazil.  JBS was the world's biggest meat producer.  J&F controlled JBS, although J&F's ownership stake in JBS varied during the relevant time period.

4.      J&F Executive 1, an individual whose identity is known to the United States and J&F, was a Brazilian citizen who was a high-level executive and partial owner of J&F.

5.      J&F Executive 2, an individual whose identity is known to the United States and J&F, was a Brazilian citizen who was a high-level executive and partial owner of J&F.

6.      Banco Nacional de Desenvolvimento Econômico e Social ("BNDES") was a Brazilian state-owned and state-controlled bank that performed government functions, including providing financing to private companies for endeavors that contributed to the development of Brazil.  BNDES's President and Board of Directors were ultimately appointed by the President of Brazil.  BNDES was an "instrumentality" of a foreign government, and BNDES's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

7.      Caixa Econômica Federal ("Caixa") was a Brazilian state-owned and state-controlled bank that performed government functions.  The Brazilian government directly owned 100 percent of Caixa.  Caixa was an "instrumentality" of a foreign government, and

Caixa's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

8.      Petróleo Brasileiro S.A. - Petrobras ("Petrobras") was a Brazilian state-owned and state-controlled oil and gas company headquartered in Rio de Janeiro, Brazil and operating in 18 other countries, including the United States, that operated to refine, produce and distribute oil, oil products, gas, biofuels and energy.  The Brazilian government directly owned a majority of Petrobras's common shares with voting rights.  Petrobras was controlled by the Brazilian government and performed government functions.  Petrobras was an "instrumentality" of a foreign government, and Petrobras's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

9.      Fundação Petrobras de Seguridade Social ("Petros") was a Brazilian state-controlled pension fund that performed government functions and was established to administer pension, retirement and death benefits for Petrobras employees.  Petrobras appointed half the members of Petros's Deliberative Board, which was Petros's highest governing body.  Petrobras also appointed the Board president, who could exercise a tiebreaker vote in the event of a split board.  The Deliberative Board had the power to appoint the President of Petros.  Petros was an "instrumentality" of a foreign government and Petros's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

10.      Brazilian Official 1, an individual whose identity is known to the United States and J&F, was a high-ranking executive at BNDES from in or about and between 2004 and 2006, and a high-ranking official in the executive branch of the Brazilian government in or about

and between 2006 and 2015.  In these roles, Brazilian Official 1 had significant influence over whether BNDES would enter into transactions in support of private companies.  Brazilian Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

11.     Brazilian Official 2, an individual whose identity is known to the United States and J&F, was a high-ranking official in the executive branch of the Brazilian government in or about and between 2003 and 2010.  Brazilian Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

12.     Brazilian Official 3, an individual whose identity is known to the United States and J&F, was a high-ranking official in the executive branch of the Brazilian government in or about and between 2010 and 2016.  Brazilian Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

13.     Brazilian Official 4, an individual whose identity is known to the United States and J&F, was a high-ranking executive of Petros in or about and between 2011 and 2014. Brazilian Official 4 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

14.     Brazilian Official 5, an individual whose identity is known to the United States and J&F, was a high-ranking official in the legislative branch of the Brazilian government in or about and between 2003 and 2016.  Brazilian Official 5 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

15.     Intermediary 1, an individual whose identity is known to the United States and J&F, was a Brazilian businessman who was a close associate of Brazilian Official 1.

16.     Intermediary 2, an individual whose identity is known to the United States and J&F, was a close associate of Brazilian Official 5.

17.     Financial Institution 1, the identity of which is known to the United States and J&F, was a multinational investment bank and financial services holding company headquartered in the United States.

IV.     The Bribery Scheme

A.     Overview

18.     In or about and between 2005 and 2017, J&F, together with others, including J&F Executive 1, J&F Executive 2, Intermediary 1 and Intermediary 2, knowingly and willfully agreed to violate the FCPA by corruptly promising and paying bribes that it understood were to, and for the benefit of, foreign officials in Brazil, including Brazilian Official 1, Brazilian Official 2, Brazilian Official 3, Brazilian Official 4 and Brazilian Official 5, to secure an improper advantage in order to obtain and retain business for J&F, specifically, to ensure that BNDES, Petros and Caixa would enter into financing and equity transactions benefitting J&F that J&F Executive 1 and other J&F personnel had negotiated with those entities.

B.     Bribery Related to BNDES

i.     Overview

19.     In or about and between 2005 and 2014, in furtherance of the bribery scheme, J&F agreed to corruptly promise and pay bribes for the benefit of Brazilian Official 1 for the purpose of improperly ensuring that BNDES would enter into certain financing and equity transactions with J&F-related entities that J&F Executive 1 and other J&F personnel had

negotiated with BNDES personnel.  J&F Executive 1 understood and intended that the bribes were also for the benefit of Brazilian Official 2 and Brazilian Official 3.

20.     To facilitate the bribery scheme and conceal the true nature of the bribe payments, J&F and its co-conspirators created shell companies, opened bank accounts for the shell companies in the United States and made payments to those accounts for the intended benefit of foreign officials in Brazil, including Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3.

21.     J&F and its co-conspirators, using bank accounts based in New York, New York caused more than $148 million in corrupt payments to be made for the benefit of Brazilian Official 1.  J&F Executive 1 also understood and intended these payments to be for the benefit of Brazilian Official 2 and Brazilian Official 3.

22.     In furtherance of the scheme, co-conspirators, including J&F Executive 1, Intermediary 1 and Brazilian Official 1, held meetings in the United States to discuss the bribery scheme.

ii.     Details of Bribery Payments Related to BNDES

23.     In or about 2006, Brazilian Official 1 became a high-ranking official in the executive branch of the Brazilian government.  In that role, Brazilian Official 1 maintained significant influence over BNDES and was able to exercise control over whether BNDES would enter into transactions that benefitted J&F and its subsidiaries.

24.     In or about and between 2005 and 2008, JBS sought and obtained financial support from BNDES for its expansion plans.  During this time, J&F Executive 1 and

6

Intermediary 1 agreed that J&F Executive 1 would pay a percentage of the financing JBS requested and received from BNDES to Intermediary 1 with the intention and understanding that the money paid to Intermediary 1 was intended for the benefit of Brazilian Official 1.  Between 2005 and 2008, J&F made corrupt payments to Intermediary 1 in connection with several BNDES transactions.

25.     In or about 2009, J&F Executive 1 stopped paying bribes to Brazilian Official 1 through Intermediary 1 and instead began communicating about bribes directly with Brazilian Official 1.  At this time, BNDES was considering purchasing approximately $2 billion of JBS debentures.

26.     In or about September 2009, at the direction of Brazilian Official 1, J&F Executive 1 opened a bank account at Financial Institution 1 in New York, New York.  The account was in the name of a shell entity, Shell Company 1, the identity of which is known to the United States and J&F.  J&F Executive 1 maintained control of Shell Company 1 and the bank account in its name.

27.     In or about December 2009, BNDES purchased approximately $2 billion of JBS debentures.  Brazilian Official 1 ensured that BNDES provided this financing.  Shortly before obtaining this financing, JBS purchased Company 3, an entity headquartered in the United States, the identity of which is known to the United States and J&F.

28.     In exchange for Brazilian Official 1's  assistance in obtaining this $2 billion equity transaction, between on or about December 30, 2009 and March 24, 2010, J&F Executive 1 caused transfers totaling approximately $55.1 million to the Shell Company 1 bank account for the benefit of Brazilian Official 1.

29.     In or about late 2010, Brazilian Official 1 told J&F Executive 1 to open a second bank account at Financial Institution 1 into which J&F Executive 1 would pay bribes. Brazilian Official 1 told J&F Executive 1 that the first bank account was also for the benefit of Brazilian Official 2 and that this new bank account would be for the benefit of Brazilian Official 3.

30.     In or about May 2011, JBS obtained financing from BNDES in the amount of 2 billion Brazilian reais.  Again, Brazilian Official 1 ensured that BNDES provided this financing.

31.     In or about June 2011, at the request of Brazilian Official 1, J&F Executive 1 opened a bank account at Financial Institution 1 in New York, New York.  The account was in the name of a shell entity, Shell Company 2, the identity of which is known to the United States and J&F.  J&F Executive 1 maintained control of Shell Company 2 and the bank account in its name.

32.     In or about and between August 2011 and January 2012, at the direction of Brazilian Official 1, J&F Executive 1 deposited $30 million into the Shell Company 2 bank account.

33.     Through in or about 2014, J&F Executive 1 continued to cause deposits to be made into the New York-based bank accounts that J&F Executive 1 maintained for the intended benefit of Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3.  The funds were transferred to the accounts in the name of Shell Company 1 and Shell Company 2 at Financial Institution 1, located in New York, New York, through wires that travelled through the Eastern District of New York.

8

34.     By in or about 2014, the two accounts in the names of Shell Company 1 and Shell Company 2 had accumulated approximately $148,668,500.  These funds represented the amount of bribe payments intended for Brazilian Official 1 for his own benefit and for the intended benefit of Brazilian Official 2 and Brazilian Official 3.

35.     In or about 2014, Brazilian Official 1 directed J&F Executive 1 to make corrupt payments to and for the benefit of various Brazilian politicians and their political campaigns.  Instead of making those payments from the Shell Company 1 and Shell Company 2 accounts at Financial Institution 1, J&F Executive 1 caused the payments to be made, including payments made in cash, from other bank accounts located in Brazil.  The payments J&F Executive 1 made to and for the benefit of various Brazilian politicians and their political campaigns, including Brazilian Official 3, at the direction of Brazilian Official 1, totaled approximately $148,668,500, which was the amount of the bribe payments that had been transferred to the Shell Company 1 and Shell Company 2 accounts at Financial Institution 1.

36.     J&F Executive 2 learned about the BNDES-related bribes sometime after 2011, at which time J&F Executive 1 told J&F Executive 2 that J&F Executive 1 held bank accounts at Financial Institution 1 that were for the benefit of Brazilian Official 1.

37.     In furtherance of the scheme, J&F Executive 1 met with Brazilian Official 1 and Intermediary 1 on multiple occasions in New York, New York to discuss the bribe payments.

C.     Bribery Related to Petros

    i.    Overview

38.    In or about and between 2011 and 2017, in furtherance of the bribery scheme, J&F agreed to corruptly promise and pay bribes to, and for the benefit of, Brazilian Official 4 for the purpose of ensuring that Petros would enter into transactions with J&F-related entities that J&F Executive 1 and other J&F personnel had negotiated with Petros personnel.

39.    To facilitate the bribery scheme and conceal the true nature of the bribe payments, J&F and its co-conspirators, among other things, created shell companies, purchased real estate in New York City and transferred the real estate to entities controlled by Brazilian Official 4.

40.    In total, from in or about and between 2011 and 2017, J&F and its co-conspirators caused approximately $4.6 million worth of corrupt payments to be made, and items of value to be transferred, for the benefit of Brazilian Official 4.  In furtherance of the scheme, certain co-conspirators, including J&F Executive 1, travelled to the United States and took acts to further the scheme's purpose.

    ii.    Details of Bribery Payments Related to Petros

41.    In or about 2009, J&F, Petros and Pension Fund 1 established Investment Vehicle 1, a company the identity of which is known to the United States and J&F.

42.    In or about 2011, J&F sought to merge Investment Vehicle 1 with another entity.  As a partial owner of Investment Vehicle 1, Petros had to approve the merger. To obtain the approval of Petros, J&F Executive 1 agreed to pay a bribe to Brazilian Official 4, who was a high-ranking executive of Petros.

43.     J&F Executive 1 and Brazilian Official 4 agreed that a portion of the bribe payment would be made by J&F Executive 1 by purchasing an apartment in New York, New York and transferring ownership of the apartment to Brazilian Official 4.  As a result, in or about July 2011, J&F Executive 1 travelled to New York to view apartments and select one to purchase as a bribe payment.

44.     Petros subsequently approved the merger involving Investment Vehicle 1, which occurred on or about November 30, 2011.

45.     In or about late 2011, J&F Executive 1 created Shell Company 3, the identity of which is known to the United States and J&F.  J&F Executive 1 controlled Shell Company 3.  On or about December 19, 2011, Shell Company 3 purchased an apartment in New York, New York (the "New York Apartment") for approximately $1.5 million.  In or about April 2012, J&F Executive 1 caused Shell Company 3 to transfer ownership of the New York Apartment to an entity controlled by Brazilian Official 4.

46.     In or about and between February 2012 and March 2017, J&F paid approximately $101,225 in expenses for the New York Apartment, including condominium fees and utilities, to benefit Brazilian Official 4.

47.     In addition, on or about October 15, 2012, J&F Executive 1 directed a transfer of $4.1 million from an account held at Financial Institution 1 to an offshore bank account controlled by Brazilian Official 4.  Of the $4.1 million, $3 million was a bribe from J&F to Brazilian Official 4 in connection with ensuring that Petros approved the merger involving Investment Vehicle 1.  The remaining $1.1 million was used to make unrelated bribe payments

11

to Brazilian Official 4 on behalf of other individuals for whom J&F Executive 1 was acting as an intermediary.

D. Bribery Related to Caixa

i. Overview

48. In or about and between 2011 and 2014, in furtherance of the bribery scheme, J&F agreed to corruptly promise and pay bribes that were intended to, and for the benefit of, Brazilian Official 5 for the purpose of ensuring that Caixa entered into certain transactions with J&F-related entities that J&F Executive 1 and other J&F personnel had negotiated with Caixa personnel.

49. In total, from in or about and between 2011 and 2014, J&F and its co-conspirators caused approximately $25 million in corrupt payments to be made with the understanding that the payments were for the benefit of Brazilian Official 5.  In furtherance of the scheme, certain co-conspirators, including J&F Executive 1, J&F Executive 2 and Intermediary 2, discussed the bribes while located in the United States.

ii. Details of the Bribery Payments Related to Caixa

50. In or about 2011, J&F was seeking financing from Caixa.  At around the same time, J&F Executive 1 was introduced to Intermediary 2.  J&F Executive 1 agreed to make corrupt payments to Intermediary 2, with the understanding that Intermediary 2 would pass the bribe payments to Brazilian Official 5.

51. Following this agreement to pay bribes to Brazilian Official 5, Caixa made numerous loans to J&F or its subsidiaries.  For example:

12

(a)     In or about November 2011, **Caixa** made a loan to J&F of 300 million Brazilian reais;

(b)     In or about August 2012, **Caixa** made a loan to J&F of 250 million Brazilian reais;

(c)     In or about November 2012, **Caixa** made a loan to J&F of 500 million Brazilian reais;

(d)     In or about July 2013, **Caixa** made a loan to a J&F subsidiary of 250 million Brazilian reais;

(e)     In or about July 2013, **Caixa** made a loan to a J&F subsidiary of 200 million Brazilian reais;

(f)     In or about August 2013, **Caixa** made a loan to a J&F subsidiary of 150 million Brazilian reais; and

(g)     In or about September 2014, **Caixa** made a loan to J&F of 300 million Brazilian reais.

52.     In or about and between 2011 and 2014, J&F made corrupt payments through Intermediary 2 in the amount of approximately $25 million, which J&F Executive 1 understood would go to Brazilian Official 5 to ensure that Caixa agreed to make the loans.

53.     In furtherance of the bribery scheme, the co-conspirators held the following meetings in the United States to discuss and advance the scheme:

(a)     In or about and between October 27 and October 29, 2011, Intermediary 2 travelled to New York, New York and met with J&F Executive 1 and J&F Executive 2.  During this trip, Intermediary 2, J&F Executive 2 and J&F Executive 1 discussed,

among other aspects of the bribery scheme, the need for financing for certain subsidiaries of J&F.

(b)    In or about 2012, Intermediary 2 and J&F Executive 1 met in New York, New York.  During the meeting, Intermediary 2 and J&F Executive 1 discussed the loans to J&F that Caixa made in or about November 2011 and August 2012, as well as the bribes that J&F paid to facilitate the loans.

<u>CONSPIRACY TO VIOLATE THE FCPA</u>

54.    The allegations contained in paragraphs one through 53 are realleged and incorporated as if fully set forth in this paragraph.

55.    In or about and between 2005 and 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant, J&F INVESTIMENTOS SA, together with others, did knowingly and willfully conspire to commit offenses against the United States, to wit: as a person other than an issuer or domestic concern, through its employees and agents, while in the territory of the United States, did corruptly commit acts in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be offered, given, and promised to a foreign official for purposes of: (a) influencing acts and decisions of such foreign official in his or her official capacity; (b) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (c) securing any improper advantage; and (d) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and

14

influence acts and decisions of such government and agencies and instrumentalities, in order to assist J&F and others in obtaining and retaining business for and with, and directing business to, J&F and others, contrary to Title 15, United States Code, Section 78dd-3.

56. In furtherance of the conspiracy and to effect its objects, the defendant J&F INVESTIMENTOS SA, together with others, committed and caused the commission of, within the Eastern District of New York and elsewhere, the following:

<u>OVERT ACTS</u>

(a) In or about July 2011, J&F Executive 1 traveled to New York, New York to view apartments and select one to purchase as a bribe payment.

(b) On or about December 19, 2011, Shell Company 3 purchased the New York Apartment for approximately $1.5 million.

(c) In or about April 2012, at J&F Executive 1's direction, Shell Company 3 transferred ownership of the New York Apartment to an entity controlled by Brazilian Official 4.

(d) On or about October 15, 2012, J&F Executive 1 directed a transfer of $4.1 million from an account held at Financial Institution 1 to an offshore bank account controlled by Brazilian Official 4.

(e) In or about and between October 27, 2011 and October 29, 2011, Intermediary 2 travelled to New York, New York and met with J&F Executive 1 and J&F Executive 2. During this trip, Intermediary 2, J&F Executive 2 and J&F Executive 1 discussed, among other aspects of the bribery scheme, the need for financing related to certain subsidiaries of J&F.

(f)     In or about 2012, Intermediary 2 and J&F Executive 1 met in New York, New York.  During the meeting, Intermediary 2 and J&F Executive 1 discussed the loans to J&F that Caxia made in or about November 2011 and August 2012 and the bribes made to facilitate the loans.

(g)     In or about July 2015, J&F Executive 1 caused a utility payment to be made for the New York Apartment, for the benefit of Brazilian Official 4.

(h)     In or about March 2017, J&F Executive 1 caused a condominium fee payment to be made for the New York Apartment, for the benefit of Brazilian Official 4.

(Title 18, United States Code, Sections 371 and 3551 et seq.)


SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK



DANIEL S. KAHN
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE